# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| GUM PRODUCTS INTERNATIONAL, INC., | |
| *Plaintiff*, | |
| v. | Court No. 25-00109 |
| UNITED STATES, | **NONCONFIDENTIAL** |
| *Defendant*, | |
| CP KELCO U.S., INC., | |
| *Defendant-Intervenor.* | |

## <u>PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

Sarah S. Sprinkle
Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
1300 Pennsylvania Ave NW, Suite 400,
Washington, D.C. 20004
(202) 730-4969
ssprinkle@strtrade.com

Dated: April 13, 2026

**TABLE OF CONTENTS**

RULE 56.2 STATEMENT ............................................................................................... 2

BACKGROUND .............................................................................................................. 3

    I.    Commerce Issues an Antidumping Duty Order on Xanthan Gum from China ................. 3

    II.    In Canada, GPI Manufactures Oilfield Products from Chinese Raw Xanthan Gum to Customer Specifications .................................................................................................... 3

    III.    Commerce Determines that GPI's Canadian Manufacturing Process was not Substantially Transformative ........................................................................................... 7

STANDARD OF REVIEW ..............................................................................................11

SUMMARY OF ARGUMENT.........................................................................................11

ARGUMENT ................................................................................................................. 12

    I.    Commerce's Analysis as to Each of the Substantial Transformation Factors is Flawed .. 12

        A.    Commerce Unreasonably Determined that GPI's Canadian Manufacturing Process did not Effect a Change in Class or Kind of Merchandise Simply Because Blended Xanthan Gum Products from China are Within the Order's Scope............................................................. 12

        B.    Commerce Unreasonably Ignored GPI's Evidence that its Canadian Manufacturing Process Changes the Physical Characteristics of Xanthan Gum, Including its Chemical Composition ...................................................................................................................... 14

        C.    In Considering End-Use, Commerce Unreasonably Ignored Evidence that the Raw Xanthan Gum Input Cannot be Used in Oilfield Applications Without Processing, and that GPI Transformed an Input Capable of General Use into a Product Suitable for Specific Use ....................................................................................................................... 17

        D.    Commerce Failed to Explain why the Value Added by GPI's Canadian Manufacturing Process was Insignificant............................................................................ 19

        E.    Commerce Unreasonably Relied on a Subjective Characterization of Xanthan Gum Production to Discount the Sophisticated Nature of GPI's Canadian Manufacturing Process ............................................................................................................................. 21

        F.    Commerce Unreasonably Faulted GPI for not Providing Evidence of the Level of Investment Needed to Make Raw Xanthan Gum.............................................................. 23

        G.    Commerce Overlooked that the Essential Characteristics of GPI's Oilfield Products—Their Superior Viscosity and Dispersibility—are Imparted in Canada ............................... 24

    II.    Even if Commerce's Substantial Transformation Analysis was Reasonable, the Value Added by Canadian Processing Falls Outside the Order's Scope ......................................... 25

CONCLUSION............................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Bell Supply Co., LLC v. United States,*
348 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ......................................... 13, 14, 17, 19, 20, 21, 22

*Bell Supply Co., LLC v. United States,*
393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) .......................................................................... 13

*Bell Supply Co., LLC v. United States,*
888 F.3d 1222 (Fed. Cir. 2018) .................................................................................... 7, 22, 25

*BYD (H.K.) Co., Ltd. v. United States,*
785 F. Supp. 3d 1359 (Ct. Int'l Trade 2025) ..................................................................... 14, 15

*Energizer Battery, Inc. v. United States,*
190 F. Supp. 3d 1308 (Ct. Int'l Trade 2016) ........................................................................... 17

*Ferrostaal Metals Corp. v. United States,*
664 F. Supp. 535 (Ct. Int'l Trade 1987) .......................................................................... 15, 16, 25

*Fort Stewart Sch. v. Fed. Lab. Relations Auth.,*
495 U.S. 641 (1990) ........................................................................................................... 14

*Guardian Indus. Corp. v. United States,*
3 C.I.T. 9 (1982) ......................................................................................................... 16, 18, 25

*Lifestyle Enter., Inc. v. United States,*
768 F. Supp. 2d 1286 (Ct. Int'l Trade 2011) ........................................................................... 20

*Nippon Steel Corp. v. United States,*
337 F. Supp. 3d 1373 (Fed. Cir. 2003) ............................................................................... 20, 24

*Peer Bearing Co.-Changshan v. United States,*
804 F. Supp. 2d 1337 (Ct. Int'l Trade 2011) ........................................................................... 20

*Peer Bearing Co.-Changshan v. United States,*
914 F. Supp. 2d 1343 (Ct. Int'l Trade 2013) ......................................... 13, 14, 17, 18, 19, 21, 22

*RH Peterson Co. v. United States,*
777 F. Supp. 3d 1356 (Ct. Int'l Trade 2025) ........................................................................... 26

*Saha Thai Steel Pipe Pub. Co. v. United States,*
101 F.4th 1310 (Fed. Cir. 2024) ........................................................................................... 25

*Sango Int'l L.P. v. United States*,
    567 F.3d 1356 (Fed. Cir. 2009) ..................................................................................11

*School Specialty, LLC v. United States*,
    2025 WL 2171718 (Ct. Int'l Trade July 31, 2025) ................................................. 18

*Whirlpool Corp. v. United States*,
    890 F.3d 1302 (Fed. Cir. 2018) .................................................................................11

**Statutes**

19 U.S.C § 1516a(b)(1)(B)(i)................................................................................................11

19 U.S.C. § 1516a(a)(2)(A)(ii) .............................................................................................11

19 U.S.C. § 1516a(a)(2)(B)(vi).............................................................................................11

28 U.S.C. § 2636(c) ..............................................................................................................11

**Rules**

USCIT Rule 3(a)(2) ...............................................................................................................11

**Regulations**

19 C.F.R § 351.225(j)(1)......................................................................................................... 7

19 C.F.R. § 351.225(c)(2) ................................................................................................ 20, 23

19 C.F.R. § 351.225(j)..............................................................................................7, 8, 11, 18

19 C.F.R. § 351.225(j)(1)(i) .......................................................................................... 8, 12, 14

19 C.F.R. § 351.225(j)(1)(ii) .......................................................................................... 8, 14, 15

19 C.F.R. § 351.225(j)(1)(iii).............................................................................................. 9, 17

19 C.F.R. § 351.225(j)(1)(iv) ............................................................................................. 9, 19

19 C.F.R. § 351.225(j)(1)(v) ............................................................................................ 10, 21

19 C.F.R. § 351.225(j)(1)(vi)........................................................................................... 10, 23

19 C.F.R. § 351.225(j)(2)................................................................................... 8, 9, 10, 15, 24

19 C.F.R. § 351.225(k)(1).................................................................................................. 16, 19

**Administrative Decisions**

Headquarters Ruling H341787 (U.S. Customs & Border Prot. May 13, 2025) ........................... 18

*Xanthan Gum from the People's Republic of China*,
   78 Fed. Reg. 43,143 (Dep't of Commerce July 19, 2013)........................................ 2, 3,  25, 26

*Xanthan Gum from the People's Republic of China: Final Scope Ruling on GPI Oilfield Lubricants*
   (Dep't of Commerce May 20, 2025)................................................................................ *passim*

*Xanthan Gum from the People's Republic of China: Preliminary Scope Ruling on GPI Oilfield
   Lubricants* (Dep't of Commerce Sept. 9, 2024) ................. …………………………...*passim*

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: TIMOTHY C. STANCEU, JUDGE

GUM PRODUCTS INTERNATIONAL, INC.,

*Plaintiff,*

v.

UNITED STATES,

*Defendant,*

CP KELCO U.S., INC.,

*Defendant-Intervenor.*

Court No. 25-00109

**NONCONFIDENTIAL**

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Xanthan gum is a thickening agent. It has a variety of uses, ranging from foods, pharmaceuticals, and cosmetics to industrial applications like oil drilling. The U.S. Department of Commerce (Commerce) has issued an antidumping (AD) duty order that covers imports of xanthan gum from China (Order); this Order does not cover xanthan gum imports from Canada.

This case concerns the country of origin for purposes of applying the scope of this order of xanthan gum products that plaintiff Gum Products International, Inc. (GPI) specially formulated in Canada for use in oil drilling. To make the oilfield products at issue in this case, GPI subjects raw xanthan gum from China—which is covered by the AD Order—and other substances to a three-step manufacturing process in Canada that alters the starting material's commercially important technical characteristics and chemical composition. Through this process, GPI tailors the properties of the oilfield products for its customers, who use them solely for oil-drilling purposes. In other words, GPI substantially transforms a raw input capable of multiple potential end uses into a specific-use end product.

In its scope ruling, Commerce disagreed that the processes deployed by GPI substantially transform the xanthan gum, largely on the grounds that the AD order covers xanthan gum even if it has been blended with other materials. But this Court has repeatedly rejected that circular reasoning, and for good reason: whether a product would have been covered by an order had it been made in China does not answer the question of whether that product was substantially transformed elsewhere. For this reason, and those that follow, Commerce's decision was unsupported by substantial evidence and otherwise contrary to law. The Court should accordingly remand to Commerce for reconsideration.

### RULE 56.2 STATEMENT

1.      GPI seeks review of Commerce's scope ruling determining that GPI's oilfield products fall within the Order's scope. Mem. from R. Anadio to S. Fullerton, re: *Xanthan Gum from the People's Republic of China: Final Scope Ruling on GPI Oilfield Lubricants* (Dep't of Commerce May 20, 2025) (the Final Scope Ruling); Mem. from R. Anadio to S. Fullerton, re: *Xanthan Gum from the People's Republic of China: Preliminary Scope Ruling on GPI Oilfield Lubricants* (Dep't of Commerce Sept. 9, 2024) (the Preliminary Scope Ruling); *see Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 43,143 (Dep't of Commerce July 19, 2013) (the Order).

2.      The issue presented is whether Commerce properly determined that GPI's oilfield products were not substantially transformed in Canada and thus fell within the scope of the Order. GPI challenges this determination as unreasonable, unsupported by substantial evidence, and otherwise contrary to law.

3.    GPI requests an order holding that Commerce's determination was not supported by substantial evidence on the record, and was otherwise not in accordance with law, and remanding this matter to Commerce for reconsideration in accordance with the Court's decision.

## BACKGROUND

### I.   Commerce Issues an Antidumping Duty Order on Xanthan Gum from China

In 2013, the U.S. Commerce Department issued the Order on xanthan gum from China. The Order covers xanthan gum, which it describes as "a polysaccharide produced by aerobic fermentation of Xanthomonas campestris.  The chemical structure of the repeating pentasaccharide monomer unit consists of a backbone of two P-1,4-D-Glucose monosaccharide units, the second with a trisaccharide side chain consisting of P-D-Mannose-(1,4)- P-DGlucuronic acid-(1,2)-a-D-Mannose monosaccharide units.  The terminal mannose may be pyruvylated and the internal mannose unit may be acetylated."  Commerce stated that the Order "covers dry xanthan gum, whether or not coated or blended with other products," and "regardless of physical form, including, but not limited to, solutions, slurries, dry powders of any particle size, or unground fiber."  Order. The Order further provides that "{x}anthan gum that has been blended with other product(s) is included in this scope when the resulting mix contains 15 percent or more of xanthan gum by dry weight. Other products with which xanthan gum may be blended include, but are not limited to, sugars, minerals, and salts."  *Id.*  Critically, however, the Order only covers such products *from China*.

### II.  In Canada, GPI Manufactures Oilfield Products from Chinese Raw Xanthan Gum to Customer Specifications

Years before the U.S. International Trade Commission's injury determination, GPI began manufacturing the subject oilfield products—GPI Xantech DF40 and GPI Xantech DF40-D—in Canada.  Scope Ruling Application at 18-19 & Att. 7.  These "are xanthan-based products that are

non-food grade xanthan powders with treatments specially tailored for use in oil drilling fluids to produce high viscosity, water-soluble natural polysaccharides." Preliminary Scope Ruling at 2. "These products have enhanced functional properties including more rapid dissolution, low powder dusting when added to water{,} and minimal clump formation during mixing of the water, sand and slurry onsite at oil drilling locations." *Id.* "The products' superior sand suspension is achieved due to a more complete dissolution of all xanthan in solution without undissolved clumps that would result in an overall lower viscosity." *Id.* at 2–3.

The basic xanthan gum imported by GPI into Canada cannot be used in the condition as imported for oil drilling—it must undergo additional processing. Scope Ruling Application at 5 ("Chinese xanthan gum on its own has a very wide range of quality and would throw their equipment off."). This processing, which is undertaken by GPI in Canada, is fine-tuned to meet the needs of oilfield customers. *Id.* "The quality parameters are so tight that customers have returned containers for 're-tuning' because it didn't hit parameters needed for their equipment to work properly." *Id.* & Att. 4. Furthermore, once processed, the oilfield products cannot be converted back into general-use raw xanthan gum. *Id.* Att. 12 ("After production, the xanthan gum ingredient can no more be altered to become 'original xanthan gum subject to the xanthan gum AD order' than the flour in a finished cake can be altered to become the original flour.").

To make the oilfield products, GPI implements a three-step manufacturing process that takes place in Canada using raw xanthan gum from China, various input materials, and specialized equipment. *Id.* at 3. At the first step, raw xanthan gum from China is conditioned with a material.[1]

---

[1] Conditioning involves "[

]."
*Id.*

At the second step, the conditioned xanthan gum is "deactivated" using a different material.[2]  Preliminary Scope Ruling at 3.  "The original xanthan {input} is more negatively charged; thus, molecules repeal each other, and this is the main cause of clumping preventing water from channeling into the center of the clump."  *Id.*  The deactivation spray treatment "renders the xanthan molecule more hydrophobic" by changing its chemical composition,[3] which causes "less clumping and a faster dissolution process at a macro level."  *Id.*

And at the third step, the product is "reactivated" using yet another material.[4]  *Id.*  This step "reactivat{es} the net negative charge" by again changing the product's chemical composition,[5] "restores the pH to the original level," and "further optimiz{es} dissolution and viscosity development."  *Id.*  The reactivated product is then pushed "through a 30-mesh screen to an ideal powder" in a "centrisifter," which "results in a superior xanthan powder that has minimal clumping, minimal dusting with rapid dissolving and viscosity development ideally suited for oil drilling."  *Id.*[6]

---

[2] Deactivation involves "[

].”  *Id.*

[3] Deactivation "[                                                                                                    ],"
which makes the product "[                                                               ].”  *Id.*

[4] Reactivation involves "[
],” which "[                                                               ].”  *Id.*  This last step's "[

].”  *Id.*

[5] As noted above, reactivation "[

].”  *Id.*

[6] For example, for one customer, one of the oilfield products must reach a target low-shear-rate viscosity of [                    ] and a dispersibility of no more than [                    ].  Scope Ruling Application, Att. 4.

The differences in physical properties between the raw Chinese xanthan gum input and GPI's oilfield products—namely, dispersibility, clumping, and viscosity—are clearly apparent in a comparison between the Chinese-origin product and the product produced by GPI in Canada:







Scope Ruling Application, Atts. 1c and 1d.

To achieve this three-step manufacturing process in Canada, GPI made significant investments. Specifically, it invested more than "1.3 million … Canadian dollars in equipment to

6

produce its xanthan-based products in Canada." *Id.* at 14. Moreover, the Canadian manufacturing process adds appreciable value to the end products.[7] Scope Ruling Application at 17.

### III. Commerce Determines that GPI's Canadian Manufacturing Process was not Substantially Transformative

GPI submitted a scope ruling application for its oilfield products, arguing that they fell outside the scope of the Order because they were substantially transformed in Canada. *See* Scope Ruling Application. "In considering whether a product is covered by the scope of the order at issue," Commerce "may need to determine the country of origin of the product." 19 C.F.R. § 351.225(j). To make this determination, Commerce "may conduct a substantial transformation analysis that considers relevant factors that arise on a case-by-case basis." 19 C.F.R § 351.225(j)(1). Generally, the "substantial transformation test asks whether, as a result of manufacturing or processing, the product loses its identity and is transformed into a new product having a new name, character and use." *Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1230 (Fed. Cir. 2018) (quotation omitted). Commerce's regulations provide various factors for it to consider in this substantial transformation analysis, including:

(i)     Whether the processed downstream product is a different class or kind of merchandise than the upstream product;

(ii)    The physical characteristics (including chemical, dimensional, and technical characteristics) of the product;

(iii)   The intended end-use of the downstream product;

(iv)    The cost of product/value added of further processing in the third country or countries;

(v)     The nature and sophistication of processing in the third country or countries; and

(vi)    The level of investment in the third country or countries.

---

[7] Specifically, the Canadian manufacturing process adds **|          |** percent of value to the raw Chinese xanthan gum input. Scope Ruling Application at 17.

*Id.* The regulations also state that Commerce "may consider where the essential component of the product is produced or where the essential characteristics of the product are imparted." 19 C.F.R. § 351.225(j)(2).

After applying the 19 C.F.R. § 351.225(j) factors, Commerce determined, in both its Preliminary Scope Ruling and its Final Scope Ruling, that GPI's processing was insufficiently transformative to render Canada the oilfield products' country of origin.

Starting with the first factor, a change in the "class or kind of merchandise" (19 C.F.R. § 351.225(j)(1)(i)), Commerce thought that GPI's oilfield products were of the same class or kind of merchandise as the raw Chinese xanthan gum input simply because both "are covered by the language of the *Order*." Preliminary Scope Ruling at 11. In the Final Scope Ruling, Commerce attempted to clarify its reasoning, claiming its finding was "not based on the downstream and upstream product being listed in the scope" but rather "on the fact that the chemical structure of both products is the same." Final Scope Ruling at 5. But Commerce failed to acknowledge that the "chemical" characteristics of the product is a separate factor. *Id.* And regardless, Commerce's attempt at clarifying its reasoning was muddied by its later observation that "GPI processes xanthan gum by blending it with ingredients to create downstream products, and such processing is explicitly included in the scope of the *Order*." *Id.*

Next, Commerce considers whether there is a change in "physical characteristics," including "chemical, dimensional, and technical characteristics." 19 C.F.R. § 351.225(j)(1)(ii). Commerce reasoned that the physical characteristics of GPI's oilfield products had not changed because "molecular charge is not a central characteristic of xanthan gum as defined by the scope of the *Order*." Preliminary Scope Ruling at 11–12. That is, Commerce's view was that only a change in an "essential characteristic," like xanthan gum's "chemical structure," could effect a

8

change in physical characteristics.  *Id.*  But essential character is a separate factor, 19 C.F.R. § 351.225(j)(2), and in any event, Commerce ignored the changes imparted to the products' chemical structure and "technical characteristics," such as superior dispersibility, viscosity, and clumping.  *Id.* at 11–12.  The same was true in Commerce's Final Scope Ruling: it focused on the fact that "the scope of the *Order* explicitly covers downstream merchandise containing xanthan gum," and ignored changes in the oilfield products' chemical and technical characteristics simply because they still contained xanthan gum.  *See* Final Scope Ruling at 6–7.

As for a change in "intended end-use," 19 C.F.R. § 351.225(j)(1)(iii), Commerce reasoned that the oilfield products' "end-use is identical to the application of the upstream product." Preliminary Scope Ruling at 12.  Commerce did not, however, contend with GPI's evidence that raw xanthan gum has a variety of potential end uses, unlike the oilfield products which only have one use, and raw xanthan gum cannot be used in oilfield applications without further processing. *Id.*  The Final Scope Ruling, for its part, emphasized that the Commission's report mentioned xanthan gum used in oilfield drilling, but failed to explain what that has to do with the change in end-use effected by GPI's Canadian manufacturing process.  Final Scope Ruling at 8.  Indeed, it is undisputed that raw xanthan gum cannot effectively be used in oilfield drilling without processing like GPI's.

Commerce's reasoning on the value added by GPI in Canada, 19 C.F.R. § 351.225(j)(1)(iv), was even more threadbare.  In the Preliminary Scope Ruling, Commerce simply compared the cost of the raw xanthan gum input to the percent of value that GPI adds in Canada and announced that this value added was "small."  Preliminary Scope Ruling at 13.  Commerce did not explain how it reached that conclusion.  *Id.*    The Final Scope Ruling added little to this analysis, simply

speculating that the raw Chinese xanthan gum input could have been "undervalued" because GPI did not prove that it was not. Final Scope Ruling at 9–10.

Regarding the "nature and sophistication of processing" in Canada, 19 C.F.R. § 351.225(j)(1)(v), Commerce merely compared a subjective description of raw xanthan gum production with GPI's Canadian manufacturing process, concluding that the former was more sophisticated than the latter, rather than relying on objective criteria. Preliminary Scope Ruling at 13–14. The Final Scope Ruling stood by this subjective comparison. *See* Final Scope Ruling at 10–11.

As for the "level of investment" in Canada, 19 C.F.R. § 351.225(j)(1)(vi), Commerce acknowledged that "GPI invested more than 1.3 million … Canadian dollars in equipment to produce its xanthan-based products in Canada." But it then faulted GPI, which does not produce raw xanthan gum, for not providing evidence of how much investment would be "necessary to produce" that "upstream product{}." Preliminary Scope Ruling at 14; Final Scope Ruling at 12.

The last factor considers where the "essential component of the product is produced or where the essential characteristics of the product are imparted." 19 C.F.R. § 351.225(j)(2). Commerce correctly noted that xanthan gum is the essential component of GPI's oilfield products. But it then ignored the essential characteristics of the products actually imported into the United States, i.e., the oilfield products' superior technical characteristics like enhanced dispersibility and viscosity that, unlike raw xanthan gum, render them suitable for specific use in oil drilling. Preliminary Scope Ruling at 15; Final Scope Ruling at 13. And those superior technical characteristics are undisputedly imparted in Canada.

Commerce's Final Scope Ruling was issued on May 20, 2025. On June 17, 2025, GPI timely filed a summons within 30 days of the Final Scope Ruling, ECF No. 1, and on July 17,

10

2025, timely filed a complaint within 30 days of filing a summons, ECF No. 13. 19 U.S.C. § 1516a(a)(2)(A)(ii); 28 U.S.C. § 2636(c); USCIT Rule 3(a)(2).

## STANDARD OF REVIEW

Commerce's decisions as to "whether a particular type of merchandise is within the class or kind of merchandise described in an … antidumping or countervailing duty order"—that is, whether a product is within an order's scope—are subject to this Court's review. 19 U.S.C. § 1516a(a)(2)(B)(vi). "The court shall hold unlawful any determination … found … to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C § 1516a(b)(1)(B)(i). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1307 (Fed. Cir. 2018 (quotation omitted). In determining whether substantial evidence supports Commerce's determinations, the Court "takes into account the entire record, which includes evidence that supports and detracts from the conclusion reached." *Sango Int'l L.P. v. United States*, 567 F.3d 1356, 1362 (Fed. Cir. 2009).

## SUMMARY OF ARGUMENT

GPI's oilfield products are fine-tuned to provide the enhanced viscosity and other commercially important characteristics that GPI's oilfield customers require. They undergo changes in chemical composition, technical characteristics, and use, and were produced in Canada only through significant investment in a sophisticated production process. Substantial evidence thus supports the conclusion that GPI substantially transforms raw Chinese xanthan gum inputs into oilfield products in Canada, thereby placing those products outside the Order's scope.

Commerce disagreed, but its reasoning fell short at every step of the analysis. For each "(j) factor" (19 C.F.R. § 351.225(j)), Commerce erred in some way that necessitates remand: it

relied on the scope of the Order multiple times to deem GPI's processing insignificant; it conflated certain factors, thereby double-counting others; it misunderstood or overlooked the transformative nature of GPI's processing; and it failed to back up its subjective characterizations of GPI's processing with any evidence or reasoning. Because Commerce's analysis as to each of the (j) factors was unreasonable, its substantial transformation determination was unsupported by substantial evidence.

## ARGUMENT

### I. Commerce's Analysis as to Each of the Substantial Transformation Factors is Flawed

Commerce's determination that GPI's oilfield products fall within the scope of the Order is unsupported by substantial evidence and otherwise contrary to law. As to each (j) factor, Commerce's analysis was unreasonable.

### A. Commerce Unreasonably Determined that GPI's Canadian Manufacturing Process did not Effect a Change in Class or Kind of Merchandise Simply Because Blended Xanthan Gum Products from China are Within the Order's Scope

Commerce's reasoning was flawed from the outset. The first (j) factor asks "{w}hether the processed downstream product is a different class or kind of merchandise than the upstream product"—that is, whether GPI's oilfield products are in a separate class from their raw Chinese xanthan gum input. 19 C.F.R. § 351.225(j)(1)(i). In the Preliminary Scope Ruling, Commerce reasoned that GPI's oilfield products—which, unlike raw xanthan gum, are specially designed and sold exclusively to oilfield operators—were of the same class or kind of merchandise as the raw Chinese xanthan gum. This conclusion was based solely on the ground that both "are covered by the language of the *Order*." Preliminary Scope Ruling at 11.

That was unreasonable. As this Court has repeatedly held, Commerce cannot merely gesture toward the language of the Order's scope in determining whether processing in a third

12

country causes a change in class or kind of merchandise. *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229, 1238 (Ct. Int'l Trade 2019); *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1289 (Ct. Int'l Trade 2018); *Peer Bearing Co.-Changshan v. United States*, 914 F. Supp. 2d 1343, 1351–52 (Ct. Int'l Trade 2013). That both the downstream and upstream products "are within the scope of the order" does not, by that fact, suggest "that a substantial transformation did not occur" in the third country. *Peer Bearing*, 914 F. Supp. 2d at 1353. Instead, Commerce must "explain how its finding that the two products are of the same class or kind of merchandise supports its ultimate conclusion that there has not been a substantial transformation." *Bell Supply*, 348 F. Supp. 3d at 1289. Otherwise, "it is not clear how this factor does any work." *Id*; *see Bell Supply*, 393 F. Supp. 3d at 1239 (explaining that "{t}his factor seems to do little work as a general matter"). But here, just as in the scope decisions at issue in *Bell Supply* and *Peer Bearing*, Commerce failed to explain its conclusion that GPI's oilfield products were of the same class or kind of product as the raw xanthan gum input apart from pointing to the scope language.

Commerce did attempt to further explain its reasoning in the Final Scope Ruling, claiming that it had actually determined that the products were of the same class or kind because of their "chemical structure" rather than the Order's language. Final Scope Ruling at 5. But this explanation falls short for a few independent reasons.

For one, it is undermined by the analysis that follows, which still impermissibly relies on the scope language. The Final Scope Ruling, after discussing the chemical-structure of the products, links that point back to "the chemical structure explicitly described by the scope of the *Order*." It then describes GPI's Canadian manufacturing process and explains that this "processing is explicitly included in the scope of the *Order*." Final Scope Ruling at 5. It continues that "the scope of the *Order*" includes products like GPI's that contain 15 percent or more xanthan gum

13

mixed with other substances. However, Commerce never explains how this supports a conclusion that the Chinese raw xanthan gum is the same class or kind of merchandise as the Canadian-origin oilfield products. *Id.* In short, the Final Scope Ruling affirms the Preliminary Scope Ruling's unexplained reliance on the scope language. *Peer Bearing*, 914 F. Supp. 2d at 1353; *Bell Supply*, 348 F. Supp. 3d at 1289.

For another, Commerce's reliance on "chemical structure" to analyze the class or kind of merchandise to which GPI's oilfield products belong is misplaced. Putting aside that GPI does, in fact, change the chemical structure of the raw xanthan gum input (as discussed below), a change in chemical characteristics is covered by 19 C.F.R. § 351.225(j)(1)(ii), not (j)(1)(i). Although Commerce has discretion in considering and weighing the (j) factors, it "must abide by its own regulations." *Fort Stewart Sch. v. Fed. Lab. Relations Auth.*, 495 U.S. 641, 654 (1990). Conflating the (j)(1)(ii) inquiry with the (j)(1)(i) inquiry effectively writes (j)(1)(i) out of the regulation. Moreover, by conflating the two, Commerce essentially "double counted" (j)(1)(ii) in weighing the (j) factors. *See BYD (H.K.) Co., Ltd. v. United States*, 785 F. Supp. 3d 1359, 1375 (Ct. Int'l Trade 2025) (agreeing with the Government in a circumvention case that evaluating value added in a third country under two separate factors, 19 U.S.C. § 1677j(b)(2)(C) and (E), "would double-count the nature of the production process within the totality of the factors").

Accordingly, Commerce failed to explain its determination that GPI's oilfield products were of the same class or kind of merchandise as their raw xanthan gum input.

## B. Commerce Unreasonably Ignored GPI's Evidence that its Canadian Manufacturing Process Changes the Physical Characteristics of Xanthan Gum, Including its Chemical Composition

Commerce likewise unreasonably determined that GPI's Canadian manufacturing process did not effect a change in physical characteristics of the raw xanthan gum. The second (j) factor

14

asks whether the processing in a third country causes a change in "physical characteristics," including "chemical, dimensional, and technical characteristics." 19 C.F.R. § 351.225(j)(1)(ii). In the Preliminary Scope Ruling, Commerce said that the physical characteristics of GPI's oilfield products had not changed because "molecular charge is not a central characteristic of xanthan gum as defined by the scope of the *Order*." Preliminary Scope Ruling at 11–12. Only a change in an "essential characteristic," like xanthan gum's "chemical structure," could effect a change in physical characteristics. *Id.*

To start, Commerce's analysis again conflates the (j) factors. Where "the essential characteristics of the product are imparted" is addressed by 19 C.F.R. § 351.225(j)(2). And by its plain terms, (j)(1)(ii) is not limited to changes in "central" or "essential" characteristics. Commerce's collapsing these two separate inquiries once more writes out one (j) factor and double counts another. *See BYD*, 785 F. Supp. 3d at 1375.

Methodological issues aside, Commerce's reasoning fails to contend with substantial evidence that GPI's oilfield products do, in fact, undergo changes in chemical composition and technical characteristics. Starting with technical characteristics, GPI's Canadian manufacturing process results in a product with superior dispersibility and viscosity, and has less clumping, than the Chinese raw xanthan gum input. These technical characteristics—especially all-important characteristic of viscosity—are fine-tuned to meet "tight" "quality parameters." Scope Ruling Application at 5 & Att. 4. Commerce completely ignored this evidence in its physical-characteristics analysis, *see* Preliminary Scope Ruling at 11–12; Final Scope Ruling at 6–7, even though the evidence suggests that a substantial transformation occurred. *See, e.g.*, *Ferrostaal Metals Corp. v. United States*, 664 F. Supp. 535, 540 (Ct. Int'l Trade 1987) (explaining that changes in steel's "strength and ductility" can be substantially transformative, as they "constitute important

characteristics of the steel"); *Guardian Indus. Corp. v. United States*, 3 C.I.T. 9, 16 (1982) (tempering "transformed" glass because, although the end product is still glass, tempering "increases its strength" and "changes the fracture characteristics").

Nor did Commerce acknowledge that GPI's Canadian manufacturing process *does* effect a change in chemical composition. In fact, it does so twice. First, during the deactivation step, the chemical composition of the raw xanthan gum is modified to increase its hydrophobic properties— one ion is swapped out for another. Second, during the reactivation step, the chemical composition is modified again to ensure that it has a net negative charge—again, swapping ions. Commerce derided this as a mere change in "molecular charge" and explained that the final product still had the chemical structure of xanthan gum as described in the Order. Preliminary Scope Ruling at 11– 12. But the fact that the end product produced in Canada retains one of xanthan gum's chemical structures included in the Order's scope does not explain why multiple changes in chemical composition during the manufacturing process should be considered insubstantial. *See Ferrostaal Metals*, 664 F. Supp. at 540 (disagreeing that a zinc protective coating was "insignificant" in the substantial-transformation analysis, as it "affect{ed} the character of the {steel} sheet by changing its chemical composition and by providing corrosion resistance").

Commerce tried to buttress its analysis in the Final Scope Ruling with references to the scope language, but that does not work for the reasons already discussed. Specifically, Commerce focused on "the plain language of the scope of the *Order*" and the fact that "the scope of the *Order* explicitly covers downstream merchandise containing xanthan gum." Final Scope Ruling at 6–7. It even cited 19 C.F.R. § 351.225(k)(1) in support. *Id.* at 7. But, again, the fact that both the downstream and upstream products would be "within the scope of the order" if they were produced

16

*in China* does not alone suggest "that a substantial transformation did not occur" in manufacturing the downstream product in Canada. *Peer Bearing*, 914 F. Supp. 2d at 1353.

Without more—at the very least, an explanation that addresses the changes to chemical and technical characteristics that occur in Canada—Commerce's determination is unreasonable.

**C. In Considering End-Use, Commerce Unreasonably Ignored Evidence that the Raw Xanthan Gum Input Cannot be Used in Oilfield Applications Without Processing, and that GPI Transformed an Input Capable of General Use into a Product Suitable for Specific Use**

On the issue of change in use, Commerce's analysis was also unreasonable and unsupported by substantial evidence. The third (j) factor instructs Commerce to consider "{t}he intended end-use of the downstream product." 19 C.F.R. § 351.225(j)(1)(iii). Commerce determined that this factor did not support a finding of substantial transformation, reasoning that the oilfield products' "end-use is identical to the application of the upstream product." Preliminary Scope Ruling at 12. But that reasoning is problematic for a number of reasons.

To begin, the record evidence regarding the upstream product—the raw Chinese xanthan gum input—establishes that it is *not* capable of being used as-is in oilfield applications. Scope Ruling Application at 5 & Att. 4. Where an upstream input "is capable of being used for" an end application "before and after processing," a change in use may not occur. *Bell Supply*, 348 F. Supp. 3d at 1293. But when that is not the case— "when the end-use of the {upstream} product {is} no longer interchangeable with the end-use of the {downstream} product," *Energizer Battery, Inc. v. United States*, 190 F. Supp. 3d 1308, 1319 (Ct. Int'l Trade 2016)—there is a change in use. And here, the raw xanthan gum is not "capable of being used" in oil drilling "before … processing." *Bell Supply*, 348 F. Supp. 3d at 1293. Raw xanthan gum's unsuitability for use in oil drilling thus suggests that GPI's processing results in a change in use. Commerce failed to address that point in its analysis. Preliminary Scope Ruling at 12.

By the same token, Commerce failed to account for the fact that GPI's Canadian manufacturing process creates a downstream product with a specific use. This is not a case where the input—raw xanthan gum—has one predetermined end use. *Cf. School Specialty, LLC v. United States*, 2025 WL 2171718, 7 (Ct. Int'l Trade July 31, 2025) (inputs that were "prefabricated in China to the specific dimensions of the production machinery" in the Philippines "possessed no use outside the manufacturing and assembly of cased pencils" (cleaned up)). It can become an ingredient in food, pharmaceutical, or cosmetic products, or it can be further processed into an oilfield product like GPI's. GPI's processing specializes the product for use in oil drilling—after all, the oilfield products are not marketed or sold to anyone other than oilfield customers, whose "tight" "quality parameters" the products are designed to meet. Scope Ruling Application at 5 & Att. 4. And because of this processing, "the uses of the {oilfield products} are much more limited and specialized than the uses of {the raw xanthan gum input}," demonstrating a change in use. *Guardian Indus.*, 3 C.I.T. at 16. Commerce overlooked this point in its analysis, too. Preliminary Scope Ruling at 12; Final Scope Ruling at 8.[8]

Commerce also suggested that there was no change in use because the Commission's report discusses products like GPI's used in oil drilling, *id.*, but that suggestion makes little sense. As this Court has explained, "{t}he use of any good, including its 'ultimate' use, is a question of fact that is not dependent on the scope of an antidumping duty order." *Peer Bearing*, 914 F. Supp. 2d

---

[8] Indeed, U.S. Customs and Border Protection recently issued a country-of-origin ruling holding that substantially similar Canadian processing of raw Chinese xanthan gum effected a substantial transformation because the processing, which consisted mostly of blending and mixing, made the product "suitable for a particular purpose in ground oil drilling." Headquarters Ruling H341787 at 9 (U.S. Customs & Border Prot. May 13, 2025). Although non-binding, 19 C.F.R. § 351.225 (j),HQ H341787 supports the conclusion that limiting xanthan gum's end-use to oil drilling is substantially transformative.

18

at 1355.  The same goes for the Commission's report.  Whether GPI's Canadian manufacturing process changed the use of the raw xanthan gum input is a factual question that does not depend on the Commission's report or its discussions of subject merchandise, even if it might otherwise be useful in interpreting the Order's scope.  *See* 19 C.F.R. § 351.225(k)(1).

Because Commerce failed to address record evidence that contradicted its determination as to change in use, Commerce's determination was unsupported by substantial evidence.

### D.  Commerce Failed to Explain why the Value Added by GPI's Canadian Manufacturing Process was Insignificant

Under the fourth (j) factor, Commerce is supposed to consider "{t}he cost of production/value added of further processing in the third country."  19 C.F.R. § 351.225(j)(1)(iv). In its Scope Ruling, Commerce noted the range of value added by GPI's Canadian manufacturing process[9] and declared that this "represents a small proportion of the value of the upstream products."  Preliminary Scope Ruling at 13.

But Commerce's *ipse dixit* cannot support its determination on this factor.  Nowhere in its analysis did Commerce explain *why* "the percentage of value added in this case {is} insignificant." *Bell Supply*, 348 F. Supp. 3d at 1294.   It just saw the range of value added, emphasized the lower end of the range, and said that this was insignificant.  Preliminary Scope Ruling at 13; Final Scope Ruling at 9.  Thus, just as in *Bell Supply*, "it is not clear at what percentage Commerce would consider value added significant under the circumstances."  *Bell Supply*, 348 F. Supp. 3d at 1294. Commerce "does not have an established threshold for determining whether a certain value-added figure constitutes substantial transformation on its own," and has no obligation to establish one,

---

[9] As noted above, "**|          |** percent of value is added to the cost of the imported Chinese xanthan gum."  Preliminary Scope Ruling at 13.

"but without an established threshold or additional explanation relating to the facts of this case, Commerce's determination that the percentage of value added in this case is not significant lacks any rationale." *Id.*; *see* Final Scope Ruling at 9. "For instance, Commerce would do well to explain why" the range of "value added is not significant within the context of the {xanthan gum} industry." *Bell Supply*, 348 F. Supp. 3d at 1294; *see, e.g.*, *Peer Bearing Co.-Changshan v. United States*, 804 F. Supp. 2d 1337, 1342 (Ct. Int'l Trade 2011) (remanding Commerce's finding that the value added in a third country was insignificant for further explanation where the record showed it accounted for "42% of the total cost of manufacturing").

The Final Scope Ruling also purported to question the amount of value added by GPI's Canadian manufacturing process, speculating that the raw xanthan gum input could have been "undervalued" because GPI did not prove that it was not. Final Scope Ruling at 9–10. Putting aside that this still fails to explain why the range of value added by GPI is somehow insignificant, Commerce cannot justify its determinations on speculation alone. *Lifestyle Enter., Inc. v. United States*, 768 F. Supp. 2d 1286, 1309 (Ct. Int'l Trade 2011). That is especially true where that speculation relies on what amounts to an adverse inference for GPI's failure to prove a negative that it was never asked, and cannot be expected, to prove. *See* 19 C.F.R. § 351.225(c)(2) (certain information is required to be included in a scope ruling application but only "{t}o the extent reasonably available to the applicant"); *Nippon Steel Corp. v. United States*, 337 F. Supp. 3d 1373, 1383 (Fed. Cir. 2003) ("An adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made{.}").

As such, Commerce's unreasoned determination that the value GPI adds to raw xanthan gum in Canada is insignificant is unsupported by substantial evidence.

20

**E. Commerce Unreasonably Relied on a Subjective Characterization of Xanthan Gum Production to Discount the Sophisticated Nature of GPI's Canadian Manufacturing Process**

The fifth (j) factor considers "{t}he nature and sophistication of processing in the third country …." 19 C.F.R. § 351.225(j)(1)(v). In determining that this factor weighed against a finding of substantial transformation, Commerce first described the process of raw xanthan gum production, then described GPI's Canadian manufacturing process, and finally compared the two. Commerce concluded that "{t}he xanthan gum processing includes several steps … compared to {GPI's} three steps, one of which may be potentially shared with the production of upstream products{.}" Preliminary Scope Ruling at 13–14. The Final Scope Ruling stood by this comparison, emphasizing Commerce's view of the "intensity and sophistication" of "upstream production," but clarifying that the "shared" step was not actually the same process but nevertheless involved "mixing" of the same "input." Final Scope Ruling at 10–11.

Commerce's analysis of the nature and sophistication of GPI's Canadian manufacturing process is unreasonable. "The record evidence upon which Commerce made" its finding consisted almost entirely of "qualitative descriptions of the processing performed in China and the processing performed in" Canada. *Peer Bearing*, 914 F. Supp. 2d at 1354. But Commerce cannot rest its finding on "merely a descriptive characterization for which {it} provided little reasoning." *Id.* at 1353. That Commerce can describe xanthan-gum production in more steps with more adjectives is a reflection of rhetorical ability rather than an analysis of the sophistication of GPI's Canadian manufacturing process in objective terms.

Nor can Commerce apply a "strict comparative analysis" between upstream and downstream processing that would effectively "preclude a finding of substantial transformation for any downstream processing." *Bell Supply*, 348 F. Supp. 3d at 1290. "Such an approach strays

21

from the focus of the inquiry, i.e., whether substantial transformation occurs as a result of the downstream processing." *Id.* In other words, downstream processing need not be more sophisticated than upstream processing to effect a substantial transformation: "A scenario could conceivably arise in which a downstream production process, though less sophisticated than the upstream production process, is still sophisticated for purposes of the substantial transformation test." *Id.* Commerce's "reducing the analysis to a mere comparison between the downstream and upstream processing" thus "does not aid in the substantial transformation inquiry in this case." *Id.* at 1291 n.9.

Even if Commerce's subjective characterizations of upstream and downstream processing were accepted, it would not demonstrate that "the nature, extent and sophistication of the {Canadian} processing were also not significant." *Peer Bearing*, 914 F. Supp. 2d at 1353 (quotation and emphasis omitted). In fact, even "minor or insignificant" "assembly or completion" can cause a product to "assume{} a new identity." *Bell Supply,* 888 F. 3d at 1222, 1230. Here, GPI's three-step process requires specialized machinery and equipment that twice changes the input's chemical composition, modifies its commercially important characteristics, and is fine-tuned to meet customers' exacting technical specifications. That this equipment may be used in "the industry" "for similar purposes or methods to garner similar information about the product," Final Scope Ruling at 11, ignores the relevant question: whether this processing is sophisticated enough to be transformative. *Peer Bearing*, 914 F. Supp. 2d at 1353; *Bell Supply*, 348 F. Supp. 3d at 1290.

In any event, Commerce's reasoning is self-defeating. Commerce suggested that there is overlap between GPI's Canadian manufacturing process and making other xanthan-gum products: GPI's machinery and equipment are usable in "the industry" for making xanthan-gum products,

and GPI's process has a mixing step that is akin to a step in xanthan-gum's production process that is ostensibly more complex.  Preliminary Scope Ruling at 13–14; Final Scope Ruling at 10–11.  Of course, GPI's manufacturing process that specially prepares xanthan gum for use in oil drilling is entirely different from the fermenting process that creates raw xanthan gum, and requires meeting exacting technical specifications.  But this purported overlap *supports*, rather than detracts from, a finding of substantial transformation: the same machinery, equipment, and mixing should lead to the same conclusion about sophistication.

Accordingly, Commerce's determination regarding the "nature and sophistication" of GPI's Canadian manufacturing process was unsupported by substantial evidence.

### F.  Commerce Unreasonably Faulted GPI for not Providing Evidence of the Level of Investment Needed to Make Raw Xanthan Gum

The only factor that Commerce found "neutral" was the sixth (j) factor: "{t}he level of investment in the third country{.}" 19 C.F.R. § 351.225(j)(1)(vi).  Commerce acknowledged that "GPI invested more than 1.3 million … Canadian dollars in equipment to produce its xanthan-based products in Canada."  But it then faulted GPI, which does not produce raw xanthan gum, for not providing evidence of how much investment would be "necessary to produce" that "upstream product{}."  Preliminary Scope Ruling at 14;[10] Final Scope Ruling at 12.

It was unreasonable for Commerce to expect GPI to produce information that it does not have.  Regulation requires GPI to provide information only "{t}o the extent reasonably available." 19 C.F.R. § 351.225(c)(2).  Information from GPI's unrelated Chinese suppliers concerning the level of investment needed to make raw xanthan gum is not reasonably available to GPI.  Suppliers

---

[10] The Preliminary Scope Ruling erroneously references "the three food ingredients subject to the Scope Ruling Application," which are the subject of a separate but related proceeding, *see Gum Prods. Int'l Inc. v. United States*, Court No. 25-00108 (Ct. Int'l Trade).

do not willingly reveal their investment expenditures or margins to buyers. Commerce cannot reasonably discount GPI's evidence of significant Canadian investment because it cannot also produce current, accurate information about the investment required to make raw xanthan gum in China. *See Nippon Steel Corp.*, 337 F. Supp. 3d at 1383.

### G. Commerce Overlooked that the Essential Characteristics of GPI's Oilfield Products—Their Superior Viscosity and Dispersibility—are Imparted in Canada

The last factor is where the "essential component of the product is produced or where the essential characteristics of the product are imparted." 19 C.F.R. § 351.225(j)(2). Commerce correctly noted that xanthan gum is the essential *component* of GPI's oilfield products, but left the analysis at that: concluding that, because xanthan gum from China is the essential ingredient, the (j)(2) factor weighed against a substantial transformation in Canada. *See* Preliminary Scope Ruling at 15; Final Scope Ruling at 13.

Commerce unreasonably ignored the essential *characteristics* of GPI's oilfield products. Here, the essential characteristics of GPI's oilfield products—especially the enhanced viscosity necessary for specific use in oil drilling that raw xanthan gum does not provide—are imparted in Canada. Indeed, GPI's oilfield customers have asked GPI to "re-tune" its oilfield products to meet the "tight" "quality parameters" needed for their use. Scope Ruling Application at 5 & Att. 4. That GPI's customers will reject product without a particular level of viscosity, among other characteristics, supports the conclusion that GPI's processing imparts the oilfield products' essential characteristics.

Instead of addressing the oilfield products' essential characteristics, Commerce noted that the products had the chemical structure of xanthan gum and maintained one of xanthan gum's potential end uses. Final Scope Ruling at 13. But that is no answer to the question of essentiality. Upstream and downstream products often have the same chemical structure and maintain one or

24

more end uses.  The question, however, is what characteristics are essential.  Thus, downstream steel products, retaining the same chemical structure and at least one of the same uses as upstream steel inputs, can still be substantial transformed through changes in "strength and ductility" because those "constitute important characteristics of the steel."  *Ferrostaal Metals*, 664 F. Supp. at 540.  The same is true of glass—tempering glass "increases its strength" and "changes the fracture characteristics," even if it does not change chemical structure.  *Guardian Indus.*, 3 C.I.T. at 16.  That is also the case here.  GPI's processing in Canada changes the essential characteristics of raw Chinese-origin xanthan gum, imparting the characteristics required for oilfield products.

Because Commerce overlooked that the essential characteristics of GPI's oilfield products are imparted in Canada, its determination was unsupported by substantial evidence.

## II.  Even if Commerce's Substantial Transformation Analysis was Reasonable, the Value Added by Canadian Processing Falls Outside the Order's Scope

Finally, even if the Court were to determine that Commerce's substantial transformation analysis is reasonable, Commerce erred in concluding that the entirety of GPI's oilfield products are subject to the Order, rather than just the raw Chinese xanthan gum inputs.  *See* Preliminary Scope Ruling at 17; Final Scope Ruling at 17.  The Order only encompasses the merchandise identified in its scope language.  *Bell Supply*, 888 F.3d at 1228.  And "the scope language cannot be interpreted or changed in a way contrary to its terms."  *Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310, 1323–24 (Fed. Cir. 2024) (quotation omitted).

Here, the scope of the Order makes no mention of downstream processing in a third country.  The Order covers "dry xanthan gum, whether or not coated or blended with other products," and "regardless of physical form, including, but not limited to, solutions, slurries, dry powders of any particle size, or unground fiber" *from China*.  Order.  It also covers "{x}anthan gum that has been blended with other product(s) … when the resulting mix contains 15 percent or

25

more of xanthan gum by dry weight." *Id.*  But it does not cover components added in a third country or work done in a third country like Canada.  *See, e.g.*, *RH Peterson Co. v. United States*, 777 F. Supp. 3d 1356, 1366 (Ct. Int'l Trade 2025) (antidumping and countervailing duty orders on Chinese sinks did not cover components from, and work performed in, Taiwan).

Accordingly, even if this Court upholds Commerce's conclusions that GPI's Canadian manufacturing process is not transformative, the Order's scope cannot be stretched to cover the value added by that process.

## **CONCLUSION**

For these reasons, Commerce's Final Scope Ruling was unsupported by substantial evidence and otherwise not in accordance with law.  The Court should remand this matter to Commerce for reconsideration.

Dated: April 13, 2026

Respectfully submitted,

/s/ Sarah S. Sprinkle
Sarah S. Sprinkle
Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
1300 Pennsylvania Ave NW, Suite 400,
Washington, D.C. 20004
(202) 730-4969
ssprinkle@strtrade.com

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word-limitation set forth in Standard Chambers

Procedure 2(B)(1), and contains 7,564 words.

/s/ Sarah S. Sprinkle
Dated: April 13, 2026                              Sarah S. Sprinkle

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: TIMOTHY C. STANCEU, JUDGE**

GUM PRODUCTS INTERNATIONAL, INC.,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

CP KELCO U.S., INC.,

*Defendant-Intervenor.*

Court No. 25-00109

**ORDER**

Upon consideration of Plaintiff's Motion for Judgment on the Agency Record, and upon all other papers and proceedings herein, it is hereby

**ORDERED** that Plaintiff's Motion is granted; and it is further

**ORDERED** that this matter is remanded to the U.S. Department of Commerce for further proceedings consistent with this opinion.

Dated: _____                    _____
         New York, New York                                      Judge