**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: TIMOTHY C. STANCEU, JUDGE**

GUM PRODUCTS INTERNATIONAL, INC.,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

CP KELCO U.S., INC.,

*Defendant-Intervenor.*

Court No. 25-00109

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Sarah S. Sprinkle
Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-0160
lmathers@strtrade.com

Dated: August 24, 2026

# TABLE OF CONTENTS

ARGUMENT ........................................ 3

I. Commerce Misapplied the Substantial-Transformation Factors and Overlooked Record Evidence Contradicting its Conclusions ........................................ 3

A. Commerce Impermissibly Relied on the Order's Scope in Determining that GPI's Canadian Oilfield Products are of the Same Class or Kind of Merchandise as Raw Chinese Xanthan Gum ........................................ 4

B. Commerce Again Impermissibly Relied on the Scope, and Overlooked Evidence of Significant Changes in Chemical and Technical Characteristics, in Addressing the Physical-Characteristics Factor ........................................ 7

C. Commerce Ignored that GPI Turned a Raw Input Capable of a Variety of End Uses Into a Specific-Use End Product ........................................ 9

D. Commerce Failed to Explain why the Value Added by GPI's Canadian Manufacturing Process was Insignificant ........................................ 11

E. Commerce Unreasonably Discounted the Sophisticated Nature of GPI's Canadian Manufacturing Process by Relying on a Qualitative Comparison Between GPI's Processing and Raw Xanthan-Gum Production ........................................ 13

F. Commerce Unreasonably Faulted GPI for not Providing Evidence of the Level of Investment Needed to Make Raw Xanthan Gum ........................................ 15

G. Commerce Overlooked that the Essential Characteristics of GPI's Oilfield Products—Their Superior Viscosity and Dispersibility—are Imparted in Canada ........................................ 16

II. Even if Commerce's Substantial Transformation Analysis was Reasonable, the Value Added by Canadian Processing Falls Outside the Order's Scope ........................................ 17

CONCLUSION ........................................ 19

# TABLE OF AUTHORITIES

**Cases**

*Aromont USA, Inc. v. United States*,
671 F.3d 1310 (Fed. Cir. 2012) ........................................ 7

*Bell Supply Co., LLC v. United States*,
348 F. Supp. 3d 1281 (Ct. Int'l Trade 2018) ........................................ 4, 9, 10, 12, 13, 14

*Bell Supply Co., LLC v. United States*,
393 F. Supp. 3d 1229 (Ct. Int'l Trade 2019) ........................................ 4, 6

*Bell Supply Co., LLC v. United States*,
888 F.3d 1222 (Fed. Cir. 2018) ........................................ 6, 13

*BYD (H.K.) Co., Ltd. v. United States*,
785 F. Supp. 3d 1359 (Ct. Int'l Trade 2025) ........................................ 5

*Cemex Inc. v. Dep't of the Interior*,
560 F. Supp. 3d 268 (D.D.C. 2021) ........................................ 3

*Crawfish Processors All. v. United States*,
483 F.3d 1358 (Fed. Cir. 2007) ........................................ 8, 10, 16

*Ferrostaal Metals Corp. v. United States*,
664 F. Supp. 535 (Ct. Int'l Trade 1987) ........................................ 5, 8, 16

*Gerald Metals, Inc. v. United States*,
132 F.3d 716 (Fed. Cir. 1997) ........................................ 2, 13

*Guardian Indus. Corp. v. United States*,
3 C.I.T. 9 (1982) ........................................ 6, 8, 10, 16

*Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........................................ 2

*Peer Bearing Co.-Changshan v. United States*,
804 F. Supp. 2d 1342 (Ct. Int'l Trade 2011) ........................................ 12

*Peer Bearing Co.-Changshan v. United States*,
884 F. Supp. 2d 1313 (Ct. Int'l Trade 2012) ........................................ 6

*Peer Bearing Co.-Changshan v. United States*,
914 F. Supp. 3d 1343 (Ct. Int'l Trade 2013) ........................................ 4, 5, 8, 10, 13, 14

*RH Peterson Co. v. United States*, 7
77 F. Supp. 3d 1356 (Ct. Int'l Trade 2025) ........ 17

*Venus Wire Indus. Pvt. Ltd. v. United States*,
424 F. Supp. 3d 1369 (Ct. Int'l Trade 2019) ........ 6

**Other Authorities**

*Certain Chassis and Subassemblies Thereof from the People's Republic of China: Antidumping Duty Order*, 86 Fed. Reg. 36,093 (Dep't of Com. July 8, 2021) ........ 18

HQ H341787 (U.S. Customs & Border Prot. May 13, 2025) ........ 13, 14

*Xanthan Gum from the People's Republic of China*,
78 Fed. Reg. 43,143 (Dep't of Com. July 19, 2013) ........ 1, 17, 18

**Regulations**

19 C.F.R. § 351.225(c)(2) ........ 15

19 C.F.R. § 351.225(j) ........ 1, 3, 6, 7

19 C.F.R. § 351.225(j)(1) ........ 3

19 C.F.R. § 351.225(j)(1)(ii) ........ 5

19 C.F.R. § 351.225(j)(2) ........ 3, 16

19 C.F.R. § 351.225(k) ........ 6, 9

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| GUM PRODUCTS INTERNATIONAL, INC.,<br>*Plaintiff*,<br>v.<br>UNITED STATES,<br>*Defendant*,<br>CP KELCO U.S., INC.,<br>*Defendant-Intervenor.* | Court No. 25-00109 |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

In Canada, plaintiff Gum Products International, Inc. (GPI) turns raw Chinese xanthan gum—which has a variety of potential end uses—into specialty xanthan-gum-based products suitable for use specifically in oil drilling. Significant value is added to the products through their Canadian processing, which, among other things, imparts the viscosity needed for oilfield use that raw xanthan gum lacks. GPI's processing thus substantially transforms a raw, general-use upstream input into downstream specific-use end products in Canada, excluding them from the relevant antidumping duty order on Chinese xanthan gum. *See Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 43,143 (Dep't of Com. July 19, 2013) (the Order).

In reaching its conclusion otherwise, the U.S. Department of Commerce erred several times over. In particular, Commerce impermissibly relied on the scope language in applying 19 C.F.R. § 351.225(j)'s substantial-transformation factors; disregarded evidence that GPI's Canadian processing converted an input capable of general end-use into a specific-use end product; and

failed to explain how the value added by that processing was insignificant. *See generally* ECF No. 40 (GPI Br.).

Commerce's reasoning, if accepted, would permit it to find that *no* third-country, downstream production of a subject input ever results in substantial transformation as long as the downstream product remains within the scope. But that presumably is the case in every scope inquiry requiring a substantial-transformation analysis. Every product necessarily shares an ultimate common end use with its input, and use of the (j) factors is only necessary if the product would otherwise be within an order's literal scope. The Court should reject Commerce's circular logic.

The government and defendant-intervenor, for their part, offer counterarguments in search of arguments. They primarily emphasize that this Court cannot reweigh the evidence for Commerce, *see* ECF No. 47 (CP Kelco Br.) at 3; ECF No. 52 (Gov't Br.) at 13, but GPI has never asked the Court to do so. Remand is warranted not because Commerce's scope ruling inappropriately weighed the evidence; rather, remand is warranted because the scope ruling overlooked record evidence that cut against its conclusions and misapplied the (j) factors in ways this Court has repeatedly condemned. Indeed, the substantial evidence standard "requires more than mere assertion of evidence which in and of itself justified the determination, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). Commerce must instead consider the "important aspect{s}" of the issue before it and formulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). Because Commerce failed to do so here, the Court should remand.

## ARGUMENT

### I. Commerce Misapplied the Substantial-Transformation Factors and Overlooked Record Evidence Contradicting its Conclusions

Commerce applies the factors listed in 19 C.F.R. § 351.225(j) to determine whether a product has been substantially transformed in a third country and is therefore outside the scope of an antidumping duty order. These factors include: "(i) Whether the processed downstream product is a different class or kind of merchandise than the upstream product; (ii) The physical characteristics (including chemical, dimensional, and technical characteristics) of the product; (iii) The intended end-use of the downstream product; (iv) The cost of production/value added of further processing in the third country or countries; (v) The nature and sophistication of processing in the third country or countries; and (vi) The level of investment in the third country or countries." 19 C.F.R. § 351.225(j)(1). Commerce "may also consider where the essential component of the product is produced or where the essential characteristics of the product are imparted." *Id.* § 351.225(j)(2).

As explained in GPI's motion for judgment on the agency record, Commerce erred at each step of the substantial-transformation analysis. *See* GPI Br. at 7–25. These errors infect Commerce's entire analysis, such that remand would still be warranted even if Commerce's reasoning could be sustained as to some factors (which it cannot). *See, e.g.*, *Cemex Inc. v. Dep't of the Interior*, 560 F. Supp. 3d 268, 280 n.7 (D.D.C. 2021) ("Where … a mistake infects the agency's analysis or the outcome of the adjudication, it crosses the {harmless error} line into arbitrary and capricious territory." (quotation omitted)). And as explained below, the government and defendant-intervenor's responses do not address these errors. Instead, they double down on Commerce's misapplication of the (j) factors.

### A. Commerce Impermissibly Relied on the Order's Scope in Determining that GPI's Canadian Oilfield Products are of the Same Class or Kind of Merchandise as Raw Chinese Xanthan Gum

Commerce reasoned in both its Preliminary Scope Ruling and its Final Scope Ruling that the oilfield products are of the same class or kind of merchandise as their Chinese inputs because both are described in the Order's scope. Preliminary Scope Ruling at 11; Final Scope Ruling at 5. As explained in GPI's motion for judgment on the agency record, however, such a finding is unreasonable: that GPI's oilfield products would be "within the scope of the order" if made in China does not suggest "that a substantial transformation did not occur" in Canada. GPI Br. at 13 (quoting *Peer Bearing Co.-Changshan v. United States*, 914 F. Supp. 3d 1343, 1353 (Ct. Int'l Trade 2013)). Commerce must explain how it reached its class-or-kind determination without relying on the language in the Order's scope. *Id.*

The government and defendant-intervenor, recognizing this problem, both assert that Commerce made no such error because it discussed the oilfield products' chemical structure and processing, Gov't Br. at 13-14; CP Kelco Br. at 4-7, but that is not an accurate reading of the scope ruling. While it is true that Commerce reasoned that GPI's products and their raw xanthan gum inputs have the "same" basic "chemical structure," the significance of that fact to Commerce was that this chemical structure was "explicitly described by the scope of the *Order*." Final Scope Ruling at 5. The same is true for Commerce's discussion of processing: the "blending" that GPI's oilfield products underwent in Canada, Commerce emphasized, "is explicitly included in the scope of the *Order*." *Id.* Under this Court's cases, this reasoning does not suffice. *Peer Bearing*, 914 F. Supp. 3d at 1353; *Bell Supply Co., LLC v. United States*, 393 F. Supp. 3d 1229, 1238 (Ct. Int'l Trade 2019); *Bell Supply Co., LLC v. United States*, 348 F. Supp. 3d 1281, 1289 (Ct. Int'l Trade 2018).

Moreover, even if Commerce's reasoning regarding the downstream and upstream products' chemical structure can be divorced from the Order's scope (which it cannot), it would still be insufficient. Change in chemical characteristics is addressed in a separate (j) factor. *See* 19 C.F.R. § 351.225(j)(1)(ii). It is unreasonable for Commerce check off one (j) factor (class-or-kind of merchandise) by double-counting another (physical characteristics). *See BYD (H.K.) Co., Ltd. v. United States*, 785 F. Supp. 3d 1359, 1375 (Ct. Int'l Trade 2025) (similar, in the context of a circumvention inquiry).

The government does not respond to this argument, *see* Gov't Br. at 13-15,[1] but defendant-intervenor counters by rehashing Commerce's point that the upstream and downstream products have the same "chemical structure expressly described in the scope language," CP Kelco Br. at 5. That does not work for the reasons already explained. And regardless, that upstream and downstream products have a similar chemical structure does not, without more, suggest that there has been no change in class or kind of merchandise (or, more importantly, no substantial transformation). Raw steel that has undergone processing to enhance its "strength and ductility" can be substantially transformed, even though the downstream product has essentially the same chemical structure. *Ferrostaal Metals Corp. v. United States*, 664 F. Supp. 535, 540 (Ct. Int'l Trade 1987); *see Peer Bearing*, 914 F. Supp. 2d at 1352 (unfinished cups and cones, though not chemically modified, could undergo substantial transformation through processing, including

---

[1] The government only responds to this argument when addressing 19 C.F.R. § 351.225(j)(1)(ii), but that response is—in any event—unavailing. *See* Gov't Br. at 17–18. GPI never argued that each (j) factor must "rest on wholly distinct pieces of record evidence," as the government claims. *Id.* Instead, as discussed above the line, the problem is that Commerce failed to explain how the record evidence supported its conclusion as to the class-or-kind of merchandise factor rather than the physical-characteristics factor—"same molecule described in the scope" does not, without more, mean "same class or kind of merchandise" or even "same technical characteristics."

grinding and polishing, into finished tapered roller bearings). So too for glass that has been tempered. *Guardian Indus. Corp. v. United States*, 3 C.I.T. 9, 16 (1982). Many raw materials presumably have the same chemical structure as substantially transformed downstream products.[2]

Furthermore, as this Court noted in *Bell Supply*, the class-or-kind "factor seems to do little work as a general matter" in a substantial-transformation inquiry. 393 F. Supp. 3d at 1239. "The class or kind of merchandise is a determination made by Commerce regarding what the final order should cover, and," at least in *Bell Supply*, it was "unclear" how "such a determination is relevant to Commerce's country of origin analysis." *Id.* at 1238–39. In other words, whether there was a change in class-or-kind of merchandise "would seem irrelevant to the precise question {of substantial transformation} that Commerce was called on to decide." *Peer Bearing Co.-Changshan v. United States*, 884 F. Supp. 2d 1313, 1320 (Ct. Int'l Trade 2012). If the downstream product is of a different class or kind of merchandise than an upstream, in-scope input, then presumably the downstream product would not be covered by the order's literal scope, obviating any need for a substantial-transformation inquiry in the first place. *See* 19 C.F.R. § 351.225(k); *Venus Wire Indus. Pvt. Ltd. v. United States*, 424 F. Supp. 3d 1369, 1377 n.10 (Ct. Int'l Trade 2019) ("The class or kind of merchandise involved in any proceeding is typically a function of, and coterminous with, the scope of merchandise for which the petitioner seeks relief{.}").[3]

---

[2] The government complains that *Ferrostaal* and *Guardian* are "pre-URAA decisions" that did not apply Commerce's substantial transformation test as currently codified in 19 C.F.R. § 351.225(j), Gov't Br. at 16, but does not explain why that matters. These decisions are informative because they applied a substantial transformation analysis that overlaps with several of the factors Commerce considers. *See Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1228–29 (Fed. Cir. 2018) (explaining that a "substantial transformation occurs where" a product emerges from processing with "a new name, character and use," and noting that Commerce considers the factors that were later codified in 19 C.F.R. § 351.225(j) (quotation omitted)).

[3] This factor might do more work if it were understood to be asking whether the downstream product is "commercially fungible" with the upstream input—that is, whether the downstream

For all these reasons, it was unreasonable for Commerce to simply point to the Order's scope and the oilfield products' chemical structure in reaching its class-or-kind determination—a determination that has questionable relevance to a substantial-transformation inquiry.

### B. Commerce Again Impermissibly Relied on the Scope, and Overlooked Evidence of Significant Changes in Chemical and Technical Characteristics, in Addressing the Physical-Characteristics Factor

Commerce determined in the Preliminary Scope Ruling that GPI's processing was insufficiently transformative because a change in "molecular charge" is not essential, unlike a change in "chemical structure." Preliminary Scope Ruling at 11 – 12 (explaining that "molecular charge is not a central characteristic of xanthan gum as defined by the scope of the *Order*"). And Commerce carried that reasoning forward in the Final Scope Ruling, explaining that it "must rely on the plain language of the scope of the *Order*," referencing a "plain language analysis under 19 CFR 351.225(k)(1)" and the products' "end-use," and finding that the oilfield products essentially have the same chemical properties and structures as in-scope xanthan gum. Final Scope Ruling at 6–7. But this reasoning falls short for the reasons just discussed: Commerce cannot conflate separate (j) factors or simply point to the scope language in engaging in a substantial-transformation analysis. GPI Br. at 15–17. Furthermore, Commerce never addressed the fact that the oilfield products have technical characteristics (especially viscosity) that differ from their raw input and that the raw input—which is not yet suitable for oilfield use—is chemically modified twice to achieve these commercially important characteristics. *Id.*

---

product is a different class or kind of merchandise due to differences in marketing, channels of distribution, recognition in trade, customer expectations, and other relevant factors not already accounted for in 19 C.F.R. § 351.225(j). *Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312–13 (Fed. Cir. 2012). *But see* Final Scope Ruling at 5 (dismissing GPI's argument that the oilfield products are of a different class or kind of merchandise due in part to a shift in tariff classification dependent on principal use).

The government and defendant-intervenor respond that Commerce did consider GPI's evidence, Gov't Br. at 15–16; CP Kelco Br. at 7–8, but the Final Scope Ruling suggests otherwise. Specifically, the Final Scope Ruling claims, without any explanation, that "the downstream merchandise has the *same* chemical properties of the inquiry merchandise." Final Scope Ruling at 7 (emphasis added). That statement fails to account for the record evidence that GPI's Canadian processing substantially changed the raw input's viscosity and clumping (among other commercially important technical characteristics) through two chemical transformations. *See* GPI Br. at 15–16. In other words, Commerce failed to acknowledge record evidence showing that the downstream merchandise has *different* chemical properties.

Regardless, even if Commerce actually considered GPI's evidence (and it did not), the conclusion that the Final Scope Ruling draws from the upstream input and downstream products both having chemical structures mentioned in the Order's scope is unreasonable. That processing does not change a raw material's chemical or molecular structure does not mean a substantial transformation has not occurred. What matters is whether the input's important characteristics have changed—for example, whether steel's "strength and ductility," *Ferrostaal*, 664 F. Supp. at 540, or glass's "strength" and "fracture characteristics," *Guardian*, 3 C.I.T. at 16, have been improved. *See also Crawfish Processors All. v. United States*, 483 F.3d 1358, 1363 (Fed. Cir. 2007) (crawfish tail meat mixed with other ingredients and improved in flavor was substantially transformed); *Peer Bearing*, 914 F. Supp. 2d at 1352–53 (lack of change in chemical properties of unfinished cups and cones was not dispositive in substantial-transformation analysis). And here, the raw Chinese xanthan gum's viscosity, among other characteristics, was substantially improved through GPI's Canadian processing to create the oilfield products—as evidenced by the products meeting oilfield customers' exacting specifications.

Both the government and defendant-intervenor say *Ferrostaal* and *Guardian* are inapposite, Gov't Br. 16–17; CP Kelco Br. at 8, but their arguments miss the point. Each case stands for the point (which Commerce did not acknowledge) that a change in chemical composition of a raw material is not required to demonstrate a substantial transformation where there has been an improvement in commercially significant characteristics of the raw material. The oilfield products, like tempered glass and galvanized and annealed steel, are substantially transformed through such improvement.

Without an explanation that addresses these changes to chemical and technical characteristics that GPI effected in Canada and that forgoes mere reliance on the scope language, however, Commerce's determination is unreasonable.

**C. Commerce Ignored that GPI Turned a Raw Input Capable of a Variety of End Uses Into a Specific-Use End Product**

Commerce insisted that the oilfield products, which were processed to be suitable for use in oilfield applications, "have the same intended end-use as upstream products" and are therefore not substantially transformed. Final Scope Ruling at 8–9. Not only did Commerce again conflate the substantial-transformation analysis under the (j) factors with interpretation of the scope language under 19 C.F.R. § 351.225(k), *see* Final Scope Ruling at 8–9 (extensively referencing the ITC's report, a (k)(1) source for analyzing *scope*, rather than *origin*), but it also ignored record evidence that the raw Chinese xanthan gum input, which can be processed into various products for various uses, is made suitable for specific use in oilfield applications only through GPI's processing. *See* GPI Br. at 17–19; *see Bell Supply*, 348 F. Supp. 3d at 1293. In other words, Commerce mistook the fact that raw xanthan gum can be processed for a variety of end uses—foods, pharmaceuticals, cosmetics, and oil drilling—as proof that GPI's processing, which resulted in a product suitable only for use in oil drilling, did not change its end use. *See* GPI Br. at 17–19.

The government and defendant-intervenor make the same mistake. Gov't Br. at 18–22; CP Kelco Br. at 9–11. Their reasoning, like Commerce's, deems *any* raw material incapable of being transformed through a narrowing in use. Yet every downstream product must, by the fact of being downstream, share a common final end use with an upstream input. The test, therefore, is not whether the downstream product shares one of the upstream input's ultimate end-uses; rather, the test is whether processing has changed the input's end-use, for example, because it has limited the input to a specific end-use for which it was not yet suitable prior to processing. *See Bell Supply*, 348 F. Supp. 3d at 1293; *Guardian Indus.*, 3 C.I.T. at 16; *see also Crawfish Processors All.*, 483 F.3d at 1363 (upstream "crawfish tail meat c{ould} be used as an ingredient in a variety of meals," whereas the downstream product was ready to eat after heating).

That xanthan gum in the *abstract*, as described in the ITC's report, can be used in oilfield applications (among many other applications), *see* Gov't Br. 19–20; CP Kelco Br. at 9–10, does not bear on whether the raw xanthan gum that GPI transformed into the oilfield products was capable of oilfield use absent that processing. *Cf. Bell* Supply, 348 F. Supp. 3d at 1292 ("The fact that the third-country processing is not necessary for the product to be used for oil and gas extraction reasonably cuts in favor of a finding that the product's essential component is the green tubes from the PRC, and therefore the processing did not constitute substantial transformation."). Nor does it bear on whether the oilfield products could still be suitable for use in xanthan gum's other potential applications. Commerce must engage with the record evidence, not theory. *See Peer Bearing*, 914 F. Supp. 2d at 1355 ("The use of any good, including its 'ultimate' use, is a question of fact that is not dependent on the scope of an antidumping duty order.").

As for the government's and defendant-intervenor's complaints about the difference between change in end-use and "product specialization," CP Kelco Br. at 10; Gov't Br. at 20–21,

both miss the mark. The point is that record evidence substantiating that GPI's oilfield products need to meet "tight" "quality parameters" relating to characteristics like viscosity, Scope Ruling Application at 5 & Att. 4, shows among other things that the raw xanthan gum was unsuitable for oilfield use without GPI's processing.[4]

Commerce thus unreasonably applied this (j) factor and overlooked record evidence of substantial transformation that cuts against its conclusions.[5]

### D. Commerce Failed to Explain why the Value Added by GPI's Canadian Manufacturing Process was Insignificant

Commerce concluded that GPI's value added in Canada was insignificant because, when considering the lower end of the range of value added (but not the higher end), it "represents a small proportion of the value of the upstream products" in relation to the cost of the raw xanthan gum input. Preliminary Scope Ruling at 13; Final Scope Ruling at 9–10. The Final Scope Ruling also speculated that the raw xanthan gum input could have been undervalued. Final Scope Ruling at 10. But neither of these explanations suffices. *See* GPI Br. at 19–20. GPI was not obligated to

---

[4] Defendant-intervenor claims that "Commerce further found that GPI's products possess *the same viscosity* as 'all basic, off-the-shelf xanthan gum{.}'" CP Kelco Br. at 10 (emphasis added). That is not accurate. In the portion of the Final Scope Ruling that defendant-intervenor cites, Commerce was summarizing GPI's Scope Ruling Comments. *See* Final Scope Ruling at 7. In those Comments, GPI explained that while all "basic, off-the-shelf xanthan gum will meet the" "viscosity parameters" mentioned in the ITC's report, it will not produce the "hydration and viscosity profiles" suitable for oilfield use, which involves heat and pressure, without GPI's processing. GPI Scope Ruling Comments at 11. This can be observed from the differences in texture, dispersibility, low shear mixing, and RVA viscosity profile between raw xanthan gum and GPI's oilfield products as shown in Attachments 1c and 1d to the Scope Ruling Application.

[5] The government also argues that U.S. Customs and Border Protection's recent ruling that blending xanthan gum with other ingredients in Canada to prepare it for oilfield use is substantially transformative, HQ H341787, is "not controlling" here. Gov't Br. at 22. GPI never claimed that it was. *See* GPI Br. at 18 n.8. But Customs' ruling, unlike Commerce's scope ruling, reasonably engages with evidence of change in end-use, and thus serves as an informative data point.

prove a negative (that third parties were not undervaluing the inputs),[6] and Commerce does not need to establish a particular "value added" threshold; however, Commerce nevertheless must explain why a particular range of value added by processing is not significant within the context of the xanthan-gum industry. *Id.*; *Bell Supply*, 348 F. Supp. 3d at 1294; *See Peer Bearing Co.-Changshan v. United States*, 804 F. Supp. 2d, 1342 (Ct. Int'l Trade 2011).

The government and defendant-intervenor again raise strawman arguments. GPI never suggested that "Commerce failed to establish a numerical threshold for 'significant' value added," Gov't Br. at 23, or that "Commerce was required to identify a specific percentage at which value added becomes significant," CP Kelco Br. at 13. GPI in fact expressly disclaimed such an argument. GPI Br. at 19–20 ("'Commerce *does not have an established threshold* for determining whether a certain value-added figure constitutes substantial transformation on its own,' *and has no obligation to establish one*, 'but without an established threshold or additional explanation relating to the facts of this case, Commerce's determination that the percentage of value added in this case is not significant lacks any rationale.'" (quoting *Bell Supply*, 348 F. Supp. 3d at 1294) (emphasis added)). As explained, the problem is not necessarily that Commerce did not come up with a threshold but rather that it failed to explain why the range of value added—or even the lower end of that range—was insignificant. *Id.* And that the value added does not account for a majority of the cost of manufacturing cannot, standing alone, justify Commerce's conclusion. *Peer Bearing Co.*, 804 F. Supp. 2d at 1342 (rejecting similar reasoning).

---

[6] Notably, both the government and defendant-intervenor decline to defend Commerce's reasoning on this ground. *See* Gov't Br. at 24 (arguing that "Commerce's value-added finding was not based solely on" this ground, but not defending it); CP Kelco Br. at 14 (same).

Commerce's unreasoned determination that the value GPI adds to raw xanthan gum in Canada is insignificant is unsupported by substantial evidence.

### E. Commerce Unreasonably Discounted the Sophisticated Nature of GPI's Canadian Manufacturing Process by Relying on a Qualitative Comparison Between GPI's Processing and Raw Xanthan-Gum Production

Commerce reasoned that, because producing raw xanthan gum requires more steps than producing GPI's oilfield products and because one of those steps is potentially shared between the two processes, GPI's Canadian processing was not sufficiently sophisticated to result in substantial transformation. Preliminary Scope Ruling at 13–14; Final Scope Ruling at 10–11. But this Court has repeatedly rejected this sort of "qualitative," "strict comparative analysis." *Peer Bearing*, 914 F. Supp. 2d at 1354; *Bell Supply*, 348 F. Supp. 3d at 1290. The inquiry is not whether GPI's Canadian processing can be subjectively described as less sophisticated than the raw xanthan-gum processing but rather whether GPI's processing is objectively sophisticated enough to effect a substantial transformation. *Bell Supply*, 348 F. Supp. 3d at 1290–91 & n.9. That can occur even through "minor or insignificant" processing. *Bell Supply Co., LLC v. United States*, 888 F.3d 1222, 1230 (Fed. Cir. 2018). And regardless, any purported overlap between the production processes for raw xanthan gum and GPI's oilfield products would bolster the conclusion that a substantial transformation has occurred, not undermine it. If blending is transformative for raw xanthan gum, blending should also be transformative for GPI's oilfield products. *See* GPI Br. at 21–23; *see also* HQ H341787; *Gerald Metals*, 132 F.3d at 720 (substantial evidence requires Commerce to take into consideration "conflicting inferences {that} could be drawn" from the same evidence).

The government, for its part, contends that *Peer Bearing* and *Bell Supply* do not control here. Gov't Br. at 25–27. But it is unclear why their reasoning should not be instructive. In both

cases, as here, Commerce unreasonably analyzed the sophistication of downstream processing, either by merely comparing it to upstream processing or by analyzing the processing qualitatively.

For example, the Final Scope Ruling admits that the Preliminary Scope Ruling both "employed a step-to-step comparison" of upstream and downstream processing and "described the individual steps" and their purported significance. Final Scope Ruling at 11. It then rejected GPI's arguments because GPI "fail{ed} to compare its {processing's} intensity and sophistication with upstream production." *Id.* That is precisely the kind of "strict comparative analysis" that *Bell Supply* condemns. 348 F. Supp. 3d at 1290. And the Final Scope Ruling likewise qualitatively derides a processing step as the mere "mixing of an input" with "isopropanol." Final Scope Ruling at 11. But qualitative descriptions are insufficient, *Peer Bearing*, 914 F. Supp. 2d at 1354, especially in light of Customs' conclusion that mixing xanthan gum with other ingredients to prepare it for oilfield use is indeed transformative, HQ H341787.

Defendant-intervenor, on the other hand, does not fight *Peer Bearing* or *Bell Supply*. *See* CP Kelco Br. at 15–17. It instead maintains that Commerce provided sufficient explanation, *see id.*, but at the same time argues that Commerce's conclusion "rested on a qualitative assessment of the respective manufacturing processes," *id.* at 16. As *Bell Supply* explains, without more, this approach is unreasonable because it "could preclude a finding of substantial transformation for any downstream processing," even though "{a} scenario could conceivably arise in which a downstream production process, though less sophisticated than the upstream production process, is still sophisticated for purposes of the substantial transformation test." 348 F. Supp. 3d at 1290. Commerce can of course "consider" upstream production processes in its analysis to evaluate the sophistication of downstream production processes within the context of "the relevant industry," *id.* at 1291 n.9, but it cannot base its analysis solely on a mere comparison, as it did here.

Commerce's determination regarding the "nature and sophistication" of GPI's Canadian manufacturing process was accordingly unsupported by substantial evidence.

**F. Commerce Unreasonably Faulted GPI for not Providing Evidence of the Level of Investment Needed to Make Raw Xanthan Gum**

Commerce found that GPI's investment of more than 1.3 million Canadian dollars to produce the oilfield products was inconclusive as to substantial transformation because GPI failed to produce records showing the level of investment necessary to produce raw xanthan gum. Preliminary Scope Ruling at 14; Final Scope Ruling at 12. But it was unreasonable for Commerce to fault GPI, which does not produce raw xanthan gum, for not producing such information. *See* GPI Br. at 23–24.

Both the government and defendant-intervenor counter that Commerce did not draw an adverse inference, Gov't Br. at 28; CP Kelco Br. at 19, but once more, they attack an argument GPI never made. As GPI explained in its motion for judgment on the agency record, the problem with Commerce's analysis is that it effectively required GPI to provide information that was not "reasonably available" to it, 19 C.F.R. § 351.225(c)(2). GPI Br. at 23–24. To this, the government and defendant-intervenor respond that Commerce noted that there was publicly available investment data concerning a Chinese xanthan-gum producer that "sought to expand its xanthan gum operations in 2010." Final Scope Ruling at 12. But Commerce never explained how data from *2010* concerning a *different producer* that was seeking to *expand* its operations would be probative of the level of investment required to make the raw xanthan gum input that GPI used to produce the oilfield products at the time of the scope ruling application. *See id.* Commerce's finding on the level-of-investment factor was thus unreasonable.

### G. Commerce Overlooked that the Essential Characteristics of GPI's Oilfield Products—Their Superior Viscosity and Dispersibility—are Imparted in Canada

Commerce concluded that the essential component of GPI's oilfield products is Chinese xanthan gum, and that therefore the products were not substantially transformed in Canada. *See* Preliminary Scope Ruling at 15; Final Scope Ruling at 13. The essential-character inquiry, however, instructs Commerce to assess where the "essential component of the product is produced *or where the essential characteristics of the product are imparted*." 19 C.F.R. § 351.225(j)(2) (emphasis added). Commerce entirely ignored that the essential characteristics of GPI's oilfield products—the viscosity, dispersibility, and other technical characteristics required for oilfield use—are imparted in Canada. GPI Br. at 24–25.

The government and defendant-intervenor accuse GPI of conflating "essential characteristics" with customer requirements. Gov't Br. at 29; CP Kelco Br. at 22. Not so. The fact that xanthan gum must be processed to such a degree to be suitable for oilfield use—as evidenced by the oilfield products needing to meet customers' "tight" "quality parameters," Scope Ruling Application at 5 & Att. 4, demonstrates that the *performance* of the oilfield products (that is, their degree of viscosity and other commercially important technical characteristics) is an essential characteristic of the product. In other words, raw xanthan gum, like raw steel or glass, provide a certain basic characteristic, but downstream processing to improve specific characteristics necessary for a particular application is substantially transformative. *Ferrostaal*, 664 F. Supp. at 540; *Guardian*, 3 C.I.T. at 16; *see Crawfish Processors All.*, 483 F.3d at 1363. Commerce failed to engage with this point at all.

Moreover, Commerce's reasoning, as defended by the government and defendant-intervenor, would effectively require a chemical transformation of raw material for a finding of substantial transformation. *See* Gov't Br. at 29 (arguing among other things that "the products

retained the scope-defined xanthan gum chemical structure"); CP Kelco Br. at 22 (similar). But that requirement would render the (j) factors a nullity. A chemical transformation into a new molecule would put the downstream product outside the literal scope of the Order. Downstream processing, however, need not remove a product from an order's scope to be substantially transformative.

Because Commerce overlooked the fact that the essential characteristics of GPI's oilfield products are imparted in Canada, its determination was unsupported by substantial evidence.

## II. Even if Commerce's Substantial Transformation Analysis was Reasonable, the Value Added by Canadian Processing Falls Outside the Order's Scope

Finally, even if Commerce's analysis were reasonable and supported by substantial evidence (it was not), Commerce nevertheless erred in concluding that the entirety of GPI's oilfield products are subject to the Order, rather than just the raw Chinese xanthan gum inputs. *See* Preliminary Scope Ruling at 17; Final Scope Ruling at 17. The Order does not cover downstream processing *in a third country*, and thus GPI's Canadian processing (including but not limited to added ingredients, logistics, overhead, and profit) must be excluded from the scope of the Order. GPI Br. at 25–26 (citing *RH Peterson Co. v. United States*, 777 F. Supp. 3d 1356, 1366 (Ct. Int'l Trade 2025)).

The government and defendant-intervenor contend that the Order does cover GPI's Canadian processing because the Order covers "blends" of xanthan gum. Gov't Br. at 35–36; CP Kelco Br. at 23–24. That is not what the Order says:

> The scope of this order covers dry *xanthan gum*, whether or not coated or blended with other products. Further, *xanthan gum* is included in this order regardless of physical form, including, but not limited to, solutions, slurries, dry powders of any particle size, or unground fiber.
>
> *Xanthan gum* that has been blended with other product(s) is in this scope when the resulting mix contains 15 percent or more of xanthan gum by dry weight. Other

> products with which xanthan gum may be blended include, but are not limited to, sugars, minerals, and salts.

Order, 78 Fed. Reg. at 43,143 (emphasis added). In other words, *xanthan gum* is in the scope of the Order, whether blended or not. The Order does not state, however, that the *entire blend* containing more than 15 percent xanthan gum is within the scope. The most natural reading of the scope is that the xanthan gum in a blend, mix, solution, or slurry is subject to the Order, but not the remainder of the blend, mix, solution, or slurry.

Moreover, the scope makes no mention of third-country processing like GPI's Canadian processing. The government argues that the phrase "resulting mix" is enough to bring third-country processing within scope, Gov't Br. at 36, but that strains the Order's plain meaning. The Order does not say that the "resulting mix" is within scope—just that "{x}anthan gum" is included, even after being blended with other products. And in any event, "resulting mix" fails to reasonably suggest mixing done in a third country would be covered by the Order. Commerce knows how to include third-country processing within an order's scope, and it did not do so here. *See, e.g.*, *Certain Chassis and Subassemblies Thereof from the People's Republic of China: Antidumping Duty Order*, 86 Fed. Reg. 36,093, 36,094 (Dep't of Com. July 8, 2021) ("Processing of finished and unfinished chassis and components … either in the country of manufacture of the in-scope product or in a third country does not remove the product from the scope."). Defendant-intervenor's policy argument that this result "would allow an importer to avoid the Order" through third-country processing, CP Kelco Br. at 24, ignores the Order's plain language and overlooks that—in such a case—the xanthan gum in the product would still be covered by the Order.

Accordingly, even if Commerce's substantial-transformation analysis were supported by substantial evidence, only the xanthan gum in GPI's oilfield products would be subject to the

Order—not other ingredients or value added in Canada (including, for example, logistics, overhead and profit).

## CONCLUSION

For these reasons, the Court should remand this matter to Commerce for reconsideration.

Dated: August 24, 2026

Respectfully submitted,

/s/ Luke Mathers
Sarah S. Sprinkle
Luke Mathers
**SANDLER, TRAVIS & ROSENBERG, P.A.**
286 Madison Avenue, Suite 1200
New York, New York 10017
(212) 549-0160
lmathers@strtrade.com

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the word-limitation set forth in Standard Chambers Procedure 2(B)(1), and contains 5,786 words.

/s/ Luke Mathers
Luke Mathers

Dated: August 24, 2026